## INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|:---:|:---|
| 1. | Complaint |
| 2. | Coversheet |
| 3. | Certificate Re: Compulsory Arbitration Pursuant to Rule 72 |
| 4. | Demand for Jury Trial |
| 5. | Notice of Intent to Dismiss for Lack of Service |
| 6. | Declaration of Service by a Private Process Server |
| 7. | Superior Court Docket |
| 8. | Notice of Removal of Action to the United States District Court, District of Arizona |

# EXHIBIT 1

```
                                        CHRIS DEROSE
                                   Clerk of the Superior Court
                                    By Vanessa Martinez, Deputy
                                    Date 11/21/2018 Time 15:27:53
                               Description                    Amount
                               ------- CASE# CV2018-097217 -------
                               CIVIL NEW COMPLAINT            333.00

                               TOTAL AMOUNT                   333.00
                                         Receipt# 26912871
```

# JACKSONWHITE
### ATTORNEYS AT LAW
*A Professional Corporation*

40 North Center Street, Suite 200
Mesa, Arizona  85201
Telephone No.:      (480) 464-1111
Facsimile No.:      (480) 464-5692
Email:      centraldocket@jacksonwhitelaw.com
*Attorneys for Plaintiff*
By:   Michael R. Pruitt, SBN 011792
        Email:      mpruitt@jacksonwhitelaw.com
        Nathaniel J. Hill, SBN 028151
        Email:      nhill@jacksonwhitelaw.com

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

Russell A. Smith, a single man,

      Plaintiff,

v.

WM Corporate Services, Inc., a Delaware
corporation; John and Jane Does I-X;
Black Corporations I-X; White
Partnerships I-X; and Red Limited
Liability Companies I-X,

      Defendants.

Case No.: CV CV2018-097217

**COMPLAINT**

(Violation of the Americans With
Disabilities Act; Retaliation in Violation of
the Americans With Disabilities Act; Age
Discrimination)

*(Jury Trial Requested)*

      Plaintiff, Russell A. Smith, by and through his counsel undersigned, and for his Complaint, alleges as follows:

      1.     Plaintiff is a single man who was at all times relevant to this action a resident of Maricopa County, Arizona.

      2.     Defendant WM Corporate Services, Inc. is a Delaware corporation doing business in Maricopa County, Arizona.

      3.     WM Corporate Services ("WM") maintains substantial, systematic, and continuous contacts with the State of Arizona.

4.     At all material times hereto, Plaintiff was an employee of WM within the definition of 29 U.S.C. § 630(f), and interpretive cases and authorities, of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"), as amended and modified, 42 U.S.C. § 12111(4) of the Americans With Disabilities Act ("ADA"), as amended, and the Americans With Disabilities Act Amendments Act ("ADAAA").

5.     At all times relevant to this action, WM was an employer as defined in 29 U.S.C. § 630(b), and interpretive cases and authorities, of the ADEA, as amended and modified, and 42 U.S.C. § 12111(5) of the ADA, as amended.

6.     John and Jane Does I-X, Black Corporations I-X, White Partnerships I-X, and Red Limited Liability Companies I-X are fictitious individuals or entities who may be liable to Plaintiff for all or part of his damages.  At this time, the true names of these individuals or entities are not known, but leave of court will be sought to add their true names at such time as they are discovered.

7.     The events giving rise to these causes of action occurred in Maricopa County, Arizona within the jurisdiction of this court.

8.     This court has subject matter jurisdiction over Plaintiff's claims.

## BACKGROUND FACTS

I.     **Plaintiff's work history with WM and job performance.**

9.     Plaintiff is a 59-year-old male who suffers from diagnosed severe obstructive sleep apnea ("OSA").

10.    Plaintiff applied for a position with WM in early 2014.  WM hired Plaintiff as a sales manager and he began working at WM on February 10, 2014.  Plaintiff held this position until his involuntary termination effective October 2, 2015, over nineteen months later.

11.    Plaintiff's job duties and responsibilities as an inside sales manager included, but were not limited to:  overseeing the daily operations of a team of 12 to 17 sales people, assisting with customer interactions; coaching and training his sales team to improve performance; scheduling and conducting team meetings; documenting relevant behaviors of the individuals he supervised and reviewing the information with human resources; motivating his team to exceed

goals on a monthly basis; interacting with all area sales directors (ASD) for the 15 markets into which his team sold, which included discussing deals, agreeing on opportunity pricing, working with field personnel to achieve customer satisfaction; and other tasks and responsibilities.

12.     Plaintiff has over 26 years of experience in the sales industry.  He was fully qualified for his position as an inside sales manager.

13.     Prior to the events giving rise to his termination, Plaintiff's job performance was always at least satisfactory, and more often, above expectations.

14.     In Defendants' Arizona sales center office, there were nine sales teams, each headed by a sales manager.  The team Plaintiff managed for most of his employment, eBusiness, was a top performing team in the sales center for every month he oversaw it.  It was one of the focused areas of growth for WM.

15.     During the over 17 months Plaintiff managed the eBusiness team at WM, he never finished below 154% to plan in any quarter and he averaged in excess of 160% to plan, despite an increase of individual sales goals from $5,000 per month to $10,000 per month during this time frame.  Plaintiff also maximized his quarterly commission every quarter he managed the eBusiness team.  According to Brad Cea, Plaintiff's supervisor, Plaintiff was the only manager to attain this level of success during the time he was employed by WM.

16.     In Plaintiff's year-end performance appraisal for 2014, dated March 10, 2015, Plaintiff's supervisor, Brad Cea wrote,

> [Plaintiff] had a strong start to his career at the Sales center.  The eBusiness team achieved 165% to goal for 2014.
>
> Goal:       $656,516
>
> Actual:     $1,084,717
>
> Revenue per FTE increased which allowed for better productivity and effectiveness with the sales leads.  Leads were down ‑20% from prior year, but the team still achieved over $100,000 in December.
>
>                          ****
>
> Overall, [Plaintiff] had a good start to his career with WM.  The eBusiness team exceeded goal and were more effective in revenue per headcount.  [Plaintiff] is a consummate sales professional and attempted to instill some of his sales best

practices into his team. [Plaintiff] did a great job with consistent accountability with most of our processes **and appreciate that [Plaintiff] was always open to feedback and suggestions. [Plaintiff] is coachable and has the desire to help the team achieve the best results.**

**\*\*\*\***

[Plaintiff] has a strong drive to exceed results and implemented a very successful contest. [Plaintiff] created an environment of reliability and accountability on his team. [Plaintiff] integrated with the team very quickly and pushed performance to a higher level in each month. [Plaintiff] achieved Manager of the Month for two months. **His team appreciated his consistent and fair approach and [Plaintiff] built credibility amongst his representatives**.

(Emphasis added.)

17.     For his mid-year performance appraisal for 2015, dated March 10, 2015, Plaintiff's supervisor observed that Plaintiff "[k]nocked it out of the park."

18.     Plaintiff also received positive feedback from members of his team.  On May 29, 2015, Jherra Ricks wrote to Brad Cea and Mr. Cea's supervisor, Dave Swedler, the following regarding Plaintiff:

... I wanted to reach out to you to take the time to acknowledge someone on my team.  I know in our all hands meetings we always discuss customer wins and the success that we have on the phone but it's not often that we recognize outstanding leadership.  I am just returning to my team after having been on leave for 4 months. I was a bit apprehensive about being able to come back and have the success that I wanted to have right away.  Not only was I welcomed back with open arms but my manager, [Plaintiff], took the time to make sure I was confident to navigate through all of my systems and jump back on the phones.  He asked me if he could do anything to help me get back in the swing of things.  The special part was that I knew he had the utmost confidence in me.  Even with the new goal at $7,000, he knew that I would knock it out of the park and make my way up the leaderboard. Considering that I had trouble getting access to my phones and all my systems for 4 days after I got back, had no pre-sales, and was a bit rusty, I was understandably a bit nervous.  (I did reach my goal in less than 3 weeks!)

In the 10 years that I have been working, I have never had a manager like [Plaintiff]. He is hardworking, trustworthy, exudes strong leadership and he pushes each person on my team to be the best that they can be.  I am not even sure if one can give their own manager points but if I could, I would give him 10,000 with no hesitation.  If I am not able to do that, the least I can do is let you know how phenomenal of a job [Plaintiff] is doing and has done with my team.  Too often people dwell on the negative things in life and do not give the same attention to the positives.  Thank you for taking the time to hear my voice.  I appreciate it.

19.     Additionally, Trisha Carmona, a sales coordinator in the sales center for WM, wrote the following, copying Brad Cea, regarding Plaintiff on July 29, 2015:

-4-

I just wanted to say thank you for all you have done for the eBusiness Team!  I have definitely appreciated things you've done for me personally but on a bigger scale, what you've done for the team.  I care about those guys as much as you do, and I just wanted you to know how much they care about you.  I've always heard nothing but great things from everyone, some in one on one convos and some in a groups [sic].  Either way, they all feel the same about you.  They rave about you and they know that you are really the FIRST and ONLY Manager who's really gone to bat for them, had their backs and who was willing to fight and stick your own neck out for them.  They appreciate you more than you know and losing you will be a big hit to the team.  Know that the whole team supports and cares for you... and most of all... we thank you!

## II.    Plaintiff's disability.

20.    Prior to starting his employment with WM, Plaintiff experienced episodes of extreme fatigue.  On occasion, he would fall asleep mid-sentence while speaking with friends. Because of this, Plaintiff spoke to his doctor and a sleep study was prescribed.

21.    Shortly after beginning work at WM, Plaintiff told his supervisor, Mr. Cea, that he was experiencing sleep problems and that he was going to have a sleep study performed to determine the cause.  Plaintiff underwent the sleep study in or around March 2014.

22.    On or around April 15, 2014, Plaintiff met with the doctor who performed the sleep study to discuss the results.  Plaintiff was diagnosed with severe obstructive sleep apnea ("OSA") and a CPAP was prescribed.  Plaintiff immediately scheduled a meeting with a respiratory therapist to receive training on the use of and to obtain the CPAP.  On the day of his appointment with the respiratory therapist, prior to leaving the office, Plaintiff discussed with his supervisor, Mr. Cea, in detail, the sleep problems he had been experiencing, the sleep study that had been performed to determine the cause of his sleep problems, his diagnosis of OSA, and the treatment that had been prescribed.  Mr. Cea told Plaintiff that his (Mr. Cea's) brother also had been diagnosed with sleep apnea and was prescribed a CPAP, but he did not like using it.  Sometime later, after Plaintiff had used his CPAP for a short time, Plaintiff again spoke with Mr. Cea about his diagnosis and told Mr. Cea about the benefits he had seen from his use of the CPAP.

23.    On or around March 7, 2014, shortly after Plaintiff underwent his sleep study, but before learning of his diagnosis of OSA (in April 2014), Plaintiff fell asleep during a manager's training class.  His supervisor, Brad Cea, verbally warned him about sleeping on the job.  As

described above, approximately a month later, Plaintiff learned of his diagnosis of OSA and discussed the diagnosis with Mr. Cea.

24.     Several months later, on August 1, 2014, during a meeting with other managers and Mr. Cea held at 3:00 p.m. and lasting several hours, Plaintiff became tired.  He closed his eyes several times during the meeting, but he did not fall asleep.  Plaintiff had been awake since 12 hours prior to the meeting, which commenced one hour after the work day was scheduled to conclude, and together with the conference room being warm, Plaintiff became groggy, but he never fell asleep.  Again, Mr. Cea verbally warned Plaintiff about sleeping on the job.

**A.     Plaintiff received an unjust and unwarranted written warning.**

25.     In September 2014, Mr. Cea showed Plaintiff a "Written Warning" dated August 26, 2014, which he intended to give Plaintiff regarding several alleged performance problems: (1) nodding off / sleeping at work for the incidents on March 7 and August 1, 2014 described above; (2) improper attention to details and failing to follow standard processes and practices; (3) internal communications with company stakeholders; and (4) his work schedule.  The "Written Warning" was not written on a WM approved disciplinary form.  In fact, Mr. Cea disregarded WM's policies and protocol and did not go through WM Human Resources with the document before presenting it to Plaintiff.

26.     Not only was the written warning prepared and presented in violation of WM's company policies and procedures, it was also unjust and unwarranted.  The allegation of improper attention to details and failing to follow standard processes and practices was regarding Mr. Cea's direction to Plaintiff to post a job opening and interview prospective candidates for a sales representative position on Plaintiff's team due to an employee being on Family and Medical Leave Act ("FMLA") leave since February 2014.  After Plaintiff posted the job, interviewed a number of candidates, and found an individual he wanted to hire, Mr. Cea told Plaintiff to cancel the job opening because another employee who had taken FMLA leave had been given a year to return to his position and for consistency he needed to do the same for this employee.  Mr. Smith emailed the individual he wanted to hire and advised him that the position was no longer available due to an FMLA issue and that he was sorry, but he no longer had an open position.  The

individual, who was a current employee of WM in its customer service center, complained to Human Resources, alleging that the position had been offered him and that he wanted the position. Plaintiff, in fact, never offered the individual the position, which in accordance with WM policy would have required a letter extending the offer in writing.

27.    The allegation of internal communications with company stakeholders was regarding a prospective customer who had been rude to and hung up on at least three members of Plaintiff's team. When the customer called back, Plaintiff attempted to talk to her. The customer also hung up on Plaintiff. The customer next contacted Waste Management's corporate office. The area sales director, Mark Olver, called Plaintiff and asked him to work with the customer. Plaintiff told Mr. Olver that the customer had hung up on at least three people from his team as well as him, and that he thought it would be best to handle the customer from within the local Southern California field office. Plaintiff then provided Mr. Olver with the customer's information. Plaintiff never heard about this matter again.

28.    Finally, regarding the allegation of Plaintiff's work schedule, at the time Plaintiff interviewed for his sales manager position at WM, he told both Mr. Cea and Dave Swedler, Senior Director Corporate Sales Optimization, that he did personal training in the afternoons. Mr. Cea responded that would not be a problem because they needed a manager who could open at 4:30 a.m. and complete his shift by 2:00 p.m. every day. Therefore, Plaintiff accepted the position with the understanding that he would work from 4:30 a.m. to approximately 2:00 p.m. every day and would not be required to work rotating shifts. Later, however, Mr. Cea began asking Plaintiff to come in later to work and stay later. Each person on Plaintiff's team knew he or she could reach Plaintiff via cell phone or email and that he responded to all requests until all team members left for the day. Mr. Cea alleged that the sales consultants who worked later did not receive the same attention from Plaintiff and that their sales were suffering. However, this was not true. The individuals who stayed later in the day never missed making a monthly goal whereas two of the individuals who worked the earliest hours each missed a goal one month during the nearly 18 months Plaintiff oversaw the team. Additionally, Plaintiff met with the other managers in the sales center twice and asked them if his working the opening schedule was

1   adversely impacting their work or personal schedules and if anyone would like to open in his

2   stead. Everyone responded that they did not want to open in place of Plaintiff and that his

3   schedule did not affect their schedules or performances. Therefore, Plaintiff believed that there

4   was appropriate coverage not only for the sales center, but for his team with his 4:30 a.m. to

5   approximately 2:00 p.m. schedule.

6       29.     For the reasons described above, Plaintiff denies the allegations in the written

7   warning.

8       30.     Additionally, Plaintiff was never spoken to or given a verbal warning about most

9   of the allegations in the write up.

10      31.     During Plaintiff's employment with WM, another employee, Michael Sherman,

11  similarly fell asleep at work. Mr. Cea knew about it, and he did not discipline Mr. Sherman, who

12  was a non-disabled employee.

13      32.     At the time Mr. Cea showed Plaintiff the written warning, Plaintiff reminded Mr.

14  Cea about his diagnosis of OSA and that he was currently being treated by a doctor regarding his

15  medical condition/disability. Mr. Cea responded that Plaintiff's diagnosis and treatment did not

16  matter because Plaintiff had violated company policy.

17      33.     Plaintiff complained to Mr. Cea that the warning was unfair, refused to sign it, and

18  asked for a meeting with Dave Swedler. At no time did Mr. Cea inquire whether Plaintiff needed

19  an accommodation or time off to deal with his serious medical condition/disability.

20      34.     Shortly thereafter, Plaintiff provided his supervisor, Mr. Cea, and human resources

21  with a letter from his doctor, dated September 29, 2014, confirming Plaintiff's diagnosis of OSA

22  in March 2014.

23      35.     Later, after providing the September 29, 2014 letter to Mr. Cea and human

24  resources, Plaintiff met with Mr. Swedler and told Mr. Swedler that he believed he was being

25  unfairly disciplined because of his medical condition/disability. Mr. Swedler responded that he

26  would review the situation and speak with Mr. Cea.

27      36.     On October 8, 2014, Mr. Cea again met with Plaintiff and gave him the August 26,

28  2014 written warning to sign. Mr. Cea told Plaintiff that Mr. Swedler told him to handle this

disciplinary action as he saw fit. After Plaintiff read the written warning, Mr. Cea told Plaintiff that if he signed the warning now, he (Mr. Cea) would keep it in his file (not send it to human resources) and that if Plaintiff showed improvement in the next ninety days it would not go in his personnel file and it would be as if there had never been a written warning. Plaintiff asked Mr. Cea if Mr. Cea would give the write up to him if his performance improved after ninety days. Mr. Cea responded, "no", that he would keep the write up in the event he needed it for documentation to terminate Plaintiff's employment at some point, in effect holding the write up over Plaintiff's head. Although Plaintiff disagreed with the allegations in the written warning, he signed the written warning on October 8, 2014.

37.   Some months later, Plaintiff met with Corina Hernandez, Human Resources Manager, and told Ms. Hernandez about the October 8, 2014 write up. Ms. Hernandez told Plaintiff that she was unaware of any write up. Plaintiff showed Ms. Hernandez a copy of the write up (prepared on makeshift letterhead and not the WM approved disciplinary form) and explained why he believed it was unjust and unwarranted. Additionally, he told Ms. Hernandez about Mr. Cea's statements to him about Mr. Cea's plan to keep the write up to use for documentation in the future to terminate him. After looking into this situation, Ms. Hernandez stated to Plaintiff that as far as she was concerned, "this [the write up] never happened."

38.   Confirming the specious nature of the October 8, 2014 written warning, Plaintiff's annual review, issued by Mr. Cea in March 2015, made no mention of the purported deficiencies contained in the October 2014 written warning and, to the contrary, stated that Plaintiff's performance for the entire year met or exceeded expectations.

**B.   Plaintiff is asked to work rotating shifts.**

39.   Beginning in or around March 2015, Mr. Cea frequently requested that Plaintiff work rotating shifts, even though Plaintiff had been promised at the time of his hire that he could work from 4:30 a.m. to approximately 2:00 p.m. every day. According to Mr. Cea and Mr. Swedler, it was necessary that Plaintiff work a rotating shift because the employees he supervised worked from 5:00 a.m. to 5:00 p.m. every day. However, the phone activity for eBusiness was heaviest between 5:00 a.m. and early afternoon and significantly dropped off after 3:00 p.m.

1   every day. Therefore, business necessities dictated that Mr. Smith should work earlier in the day.

2   Additionally, Plaintiff was always available to the employees he supervised by cell phone and/or

3   email until the work day ended at 5:00 p.m. and often later. Moreover, Plaintiff's team

4   consistently exceeded goals and was frequently the top team in the sales center, strongly

5   suggesting there was no legitimate business reason to require Plaintiff to work rotating shifts.

6   Finally, due to his medical condition, working rotating shifts would exacerbate Plaintiff's

7   symptoms of OSA and adversely affect his work performance. No other managers were similarly

8   required to work rotating shifts nor was any former manager of the eBusiness team asked to work

9   a rotating schedule.

10       **C.**    **Plaintiff requests FMLA leave.**

11       40.    Because of Plaintiff's disability, and at the suggestion of his doctor, around March

12   30, 2015, Plaintiff contacted WM and requested intermittent FMLA leave to take time off of

13   work and receive medical treatment. Mr. Cea had been making ongoing demands that Plaintiff

14   work rotating shifts despite Plaintiff's report that it would exacerbate his disability. No one

15   within WM engaged in an interactive process in response to Plaintiff's request for an

16   accommodation for his medical condition. Notwithstanding, Plaintiff's doctor completed a

17   Certification of Healthcare Provider for Employee's Serious Health Condition, dated April 2,

18   2015. Shortly thereafter, Plaintiff and WM received a letter from Sedgwick Claims Management

19   Services, Inc. dated April 7, 2015, approving his FMLA leave from March 31, 2015 through

20   September 30, 2015. From this request, WM was unmistakably aware of Plaintiff's need for an

21   accommodation.

22       **D.**    **Plaintiff is forced to change his work hours.**

23       41.    On April 17, 2015, in response to Mr. Cea's continuing frequent requests that

24   Plaintiff work rotating shifts, Plaintiff sent an email to Mr. Cea stating:

25          After speaking with Laurie and the hours she kept while overseeing eBusiness[,] I
             think I have an excellent solution. Starting next week[,] I will be in the office 7:00

26          – 15:30. With this schedule[,] I will catch the last six hours of the earliest to arrive
             and be with the closers for six and one[-]half hours.

27

28          Please let me know if this meets your expectations.

42.     On April 17, 2015, Mr. Cea responded to Plaintiff's email, "[i]f you believe this provides the best coverage for your team, then please move forward.  Is Rick going to continue to open?"  Plaintiff responded, "[h]e will and I will certainly be coming in earlier than 7:00 since I will be up any way."  Thereafter, Plaintiff reluctantly began working a different shift.

43.     Under the new schedule, Plaintiff commenced working before 7:00 a.m. and usually left work at approximately 3:30 p.m.

**III.     Plaintiff requests a reasonable accommodation.**

44.     The new schedule proved to be a challenge for Plaintiff's disability.  Unable to adjust his internal clock to sleep later than 3:00 a.m., Plaintiff realized that the most beneficial accommodation would be to revert to 4:30 a.m. to 2:00 p.m., and on May 20, 2015, Plaintiff submitted a formal written request to do so.  Plaintiff submitted a formal request to human resources for a reasonable accommodation due to his medical condition so that he could work the hours he had worked since the beginning of this employment.  In his request, Plaintiff wrote that he had recently sought guidance from the EEOC regarding the written warning he received October 8, 2014 and Mr. Cea's requests to change his work hours after 15 months.  Additionally, he stated that he was concerned that working different shifts would adversely affect his health and ability to perform his job.  Following this request, Ms. Hernandez met with Plaintiff regarding his request for a reasonable accommodation.  Later, Plaintiff's request was effectively denied.

45.     On May 26, 2015, Plaintiff was told to work from 7:00 a.m. to 4:00 p.m. (or 3:30 p.m. if he took a 30 minute lunch), effectively denying his accommodation request to work from 4:30 a.m. to 2:00 p.m.  He was told this schedule was to remain in place until WM completed a review of Plaintiff's ADA accommodation request.

46.     Shortly thereafter, Ms. Hernandez sent Plaintiff a Request For Limited Medical Information form, which Ms. Hernandez requested Plaintiff's doctor complete and return to her.  The form asked Dr. Arpino to "describe the accommodations that will enable the Employee to perform the essential functions of the job."  Dr. Arpino wrote, "[c]onsistent work schedule starting time at 6 AM."

47.     Dr. Arpino was also asked on this form to describe how this accommodation would assist Plaintiff in performing the essential functions of his job. Dr. Arpino wrote, "[p]atient has sleep disturbance and requires consistent regular sleep pattern to avoid hypersomnia."

48.     Plaintiff submitted this form to Ms. Hernandez on or around July 1, 2015.

**IV.     Plaintiff was subjected to unlawful discrimination.**

49.     On July 13, 2015, Mr. Cea and WM's Human Resources Manager, Corina Hernandez, met with Plaintiff regarding his request for an ADA-compliant reasonable accommodation. During this meeting, Plaintiff was told that his requested accommodation would be approved with the contingency that Plaintiff would have to change teams from the eBusiness team he had successfully managed for the past 17 months to the SnapShot team. According to Ms. Hernandez and Mr. Cea, the reasons for the change in teams were twofold: first, since Justin Knight, the manager of the SnapShot team, and Plaintiff had both previously indicated that they wanted to move up in the company, this move would give them both better visibility and exposure; and second, by moving Justin Knight to the eBusiness team, Mr. Knight would work a later shift and provide better coverage for the eBusiness team.[1]

50.     In fact, there was no legitimate business reason to move Plaintiff to the SnapShot team. Even other managers in the sales center with whom Plaintiff spoke regarding this change told Plaintiff that they could not see any legitimate business justification for the move. Moving Plaintiff to the SnapShot team did not give him better visibility or exposure. As the manager of the eBusiness team, Plaintiff worked with fifteen of the seventeen markets in the United States and Canada. Moving to the manager of the SnapShot team reduced his exposure to just five markets.

51.     The exact opposite applied for Mr. Knight. Mr. Knight's exposure in the company was greatly enhanced by the move. He went to the top sales team (which enjoyed that position due, in large part, to Plaintiff's work) with fifteen markets, all supported by the corporate arm of

---

[1] The eBusiness team worked from 5:00 a.m. to 5:00 p.m. whereas the SnapShot team only worked from 5:00 a.m. to 2:30 p.m. each day.

WM, and in contrast, Plaintiff was moved to the SnapShot team, with significantly less exposure (with only five markets) and with a much more precarious position not financially supported by the corporate arm of WM.

52.     Mr. Knight was also not put on a later (or rotating) schedule when he was moved to Plaintiff's position, which was one of the explanations given Plaintiff for the move. From the time Mr. Knight was moved into the manager of the eBusiness position, he worked from 5:00 a.m. to 1:30 p.m., which were substantially the same hours Plaintiff had worked from February 2014 to mid-April 2015.

53.     Approximately two days after the July 15, 2015 meeting with Brad Cea and Corina Hernandez, an announcement was made regarding the decision to move Plaintiff from his position as manager of the eBusiness team to manager of the SnapShot team and Mr. Knight from his position as manager of the SnapShot team to manager of the eBusiness team. Plaintiff and Mr. Knight's roles officially changed on or around August 2, 2015.

54.     Mr. Knight was much younger than Plaintiff, 32 years old, and was not disabled.

55.     In or around this same time (mid to late July 2015), Plaintiff filed a Charge of Discrimination, Charge No. 846-2015-22014, with the U.S. Equal Employment Opportunity Commission ("EEOC") against WM alleging discrimination. An unperfected copy of the charge of discrimination had previously been sent to WM on May 1, 2018.

56.     On or around August 6, 2015, after Plaintiff's official move to the SnapShot team, Ms. Hernandez sent Plaintiff a letter formally approving his requested accommodation. The letter states in pertinent part:

> .... Due to your current restrictions, you requested **a consistent work schedule starting time at 6am.**
>
> After discussing this request with you and evaluating the business needs, we have determined that we will be able to provide your requested accommodation. This accommodation will be in place **August 3, 2015 – August 3, 2016,** unless business needs require that we review this situation earlier.
>
> Should you believe you need an extension of this accommodation, or if you later determine the accommodation is not working for you, please let me know so that we can revisit you [sic] accommodation status.

(Emphasis added.)

57.    That same day (August 6, 2015), the EEOC mailed a notice of right to sue to Plaintiff, in connection with Charge of Discrimination No. 846-2015-22014, which had been filed by Plaintiff in or around mid to late July 2015.

58.    Within approximately two weeks of the announcement of the manager change previously described, three employees on the SnapShot team resigned, bringing the total number of employees from 17 down to 14.   Later, during approximately the last week of July, WM announced that it was forming a new team for the WI/MN areas and that due to the importance of the new team, WM was moving the three best sales people on the SnapShot team to the new WI/MN team as seed employees to jump start the new team.   This brought the number of employees on the SnapShot team down to eleven.   On or around August 15, 2015, another employee resigned rather than being terminated due to attendance issues.   This brought Plaintiff's new team down to ten employees.   On or about September 1, 2015, another employee on the SnapShot team left on FMLA leave, bringing the number of employees down to nine.   Despite the significant personnel changes on the SnapShot team, the team goals were achieved.

V.    **Plaintiff's termination.**

59.    Approximately two months after moving Plaintiff to the SnapShot team, on September 30, 2015, without warning, Plaintiff's position was eliminated and the nine remaining employees on his team were moved to other teams as part of an alleged reorganization.

60.    Plaintiff spoke with Ms. Hernandez in Human Resources at the time of his discharge, informing her of the need for WM to retain and not destroy any electronic communications. Ms. Hernandez said there was no need to do so since Plaintiff was laid off (not fired) and the internal record of WM indicated that Plaintiff was eligible for rehire.

61.    Plaintiff was not moved to another team or even offered a sales position or given time to seek another position in the enterprise as all others had been given every time a team moved or was down-sized.

62.    No other managers, or other employees, were similarly terminated.

63.   At the time of his termination, Plaintiff was more qualified than many of the managers who were retained, had more tenure, and was the second oldest manager in the sales center.  Plaintiff was 56-years-old at the time of his discharge.

64.   Consistent with Plaintiff's claim that he was told his position was eliminated, WM's advice to Plaintiff that his position had been eliminated (and contrary to WM's subsequent assertion that Plaintiff was discharged for cause), Plaintiff was given a General Release Agreement to consider, promising him twelve weeks of pay plus a one-time lump sum payment of $11,250.00, and twelve weeks of COBRA premium payments in excess of his regular employee premium contribution, if he released his claims against WM.

65.   Plaintiff was terminated, in whole or in part, because of his age and/or because of his disability, and/or because he had engaged in legally protected activities.

66.   As a result of Defendants' actions, Plaintiff has been damaged and continues to be damaged.

67.   Plaintiff has also suffered emotional distress because of the illegal and inappropriate treatment he has received from WM.

68.   On February 16, 2016, Plaintiff filed a second charge of discrimination with the EEOC against WM alleging discrimination.

69.   On August 31, 2018, the EEOC mailed Plaintiff a right to sue.

70.   Plaintiff timely filed this lawsuit.

## COUNT I

### (Violation of the ADA and ADAAA)

71.   All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

72.   WM violated the ADA, as amended, by discriminating against Plaintiff with respect to the terms, conditions, or privileges of employment because of Plaintiff's impairments or perceived impairments, that substantially limited one or more major life activities, because of a record of such impairments, or because Plaintiff was regarded as having such impairments.

73.     Plaintiff has a disability or handicap, is perceived as having a disability or handicap, or is regarded as having a disability, or having a record of such impairment within the meaning of the ADA, 42 U.S.C § 12102(1).

74.     Plaintiff has severe obstructive sleep apnea ("OSA"). He was diagnosed with OSA in 2014. WM was aware of Plaintiff's medical condition and disability. Plaintiff's medical condition is an impairment which substantially limits him, or Plaintiff is perceived as having an impairment that substantially limits him, in one or more major life activities.

75.     Plaintiff was fully qualified for the position he held at WM and he met the minimum qualifications of the position with or without a reasonable accommodation.

76.     WM limited, segregated, or classified Plaintiff in a way that deprived or tended to deprive him of employment opportunities or otherwise affected his status as an employee, in violation of the ADA.

77.     WM failed to or refused to reasonably accommodate Plaintiff's disability. Making an accommodation for Plaintiff would not have been unduly burdensome to the operation of WM.

78.     WM had a duty to interact with Plaintiff to try to arrive at a reasonable accommodation pursuant to the ADA; however, WM failed to engage in the mandatory interactive process in good faith with Plaintiff, or to attempt in good faith to identify and implement a reasonable accommodation in violation of the ADA.

79.     WM also failed in its continuing duty to engage in the mandatory interactive process with Plaintiff to attempt in good faith to identify and implement a reasonable accommodation for Plaintiff's disability in violation of the ADA.

80.     WM terminated Plaintiff because of his disability in violation of the ADA, as amended.

81.     The effect of these unlawful employment practices has been to classify, limit, and discriminate against Plaintiff in ways that jeopardize and tend to deprive him of his employment opportunities and otherwise adversely affect his status as an employee because of his disability in violation of the ADA.

82.     Plaintiff, a victim of WM's unlawful employment practices, has suffered economic damages in an amount to be determined at trial.

83.     Furthermore, WM and/or its agents committed the acts or omissions complained of herein intentionally, willfully, maliciously, wantonly, or with reckless indifference to Plaintiff's legal rights and sensibilities.  In treating Plaintiff as alleged, WM acted solely to serve its own interests and consciously or callously disregarded the substantial risk of significant harm its acts or omissions would cause Plaintiff.  Consequently, Plaintiff is entitled to recovery for his pain and suffering, punitive damages, and all other damages permitted under law in an amount to be proved at trial.

## COUNT II

### (Retaliation in Violation of the ADA)

84.     All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

85.     Plaintiff engaged in protected activities by requesting a reasonable accommodation from WM and filing a charge of discrimination with the EEOC while employed by WM.

86.     Plaintiff suffered retaliation on the part of Defendant WM for seeking his rights under the ADA when Defendant took the adverse employment actions described herein against Plaintiff affecting the terms, conditions, and privileges of his employment.  This retaliation took the form of (1) disciplining Plaintiff inconsistent with Company policy; (2) changing his work schedule; (3) moving Plaintiff to a less prestigious, tenuous position; and (4) terminating Plaintiff's employment.

87.     Defendant WM's actions were in violation of the ADA and were not justified by any legitimate, nondiscriminatory business reason.

88.     Defendant WM violated the ADA by retaliating against Plaintiff with respect to the terms, conditions, or privileges of his employment because of his request for a reasonable accommodation to work the hours he had worked since the beginning of his employment and for contacting the EEOC because he believed he was being discriminated against in violation of the ADA and reported his consultation with the EEOC to his supervisor and human resources.

89.     Plaintiff has suffered retaliation in violation of the ADA and is therefore entitled to recover all remedies available to him under the ADA.

90.     As a result of the actions of Defendants WM, Plaintiff has suffered economic damages in an amount to be proved at trial.

91.     Defendant WM committed the acts or omissions complained of herein intentionally, willfully, maliciously, wantonly, or with reckless indifference to Plaintiff's legal rights and sensibilities.  Defendant WM acted solely to serve its own interests and consciously or callously disregarded the substantial risk of significant harm its acts or omissions would cause Plaintiff.  Consequently, Plaintiff is entitled to recovery for his pain and suffering, for punitive damages, and for all other damages permitted under law in an amount to be proved at trial.

**COUNT III**

**(Age Discrimination in Violation of the ADEA)**

92.     All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

93.     The acts, policies, and practices of WM as alleged herein above, violate the ADEA's age discrimination provisions.

94.     WM treated Plaintiff differently than other employees or persons who are younger than Plaintiff.  This disparate treatment included, but is not limited to, terminating Plaintiff solely as part of an alleged restructuring and retaining other, younger employees and/or employees with less tenure.

95.     In subjecting Plaintiff to different and discriminatory treatment in the terms and conditions of his employment different from that of younger employees, WM willfully and intentionally discriminated against Plaintiff on the basis of age.

WHEREFORE, Plaintiff requests that this court enter judgment in his favor and against Defendant WM as follows:

A.      Declare that the employment practices complained of in this Complaint are unlawful and that they violate 42 U.S.C. § 12101, *et seq.* (the ADA and ADAAA) and 29 U.S.C. § 621, *et seq.* (the Age Discrimination in Employment Act);

-18-

B.   Order Defendant to make Plaintiff whole, pursuant to 42 U.S.C. 12101, *et seq*. (the ADA and ADAAA) and 29 U.S.C. § 621, *et seq*. (the Age Discrimination in Employment Act);

C.   Order Defendant to pay Plaintiff's actual damages in an amount to be proven at trial for all of his claims;

D.   Order Defendant to make Plaintiff whole with full back pay, front pay, and reimbursement for all loss of pension, retirement, insurance, Social Security, and other monetary and non-monetary benefits, all amounts to be proven at trial;

E.   Order Defendant to pay Plaintiff's general and compensatory damages for his economic losses, pain and suffering, emotional distress, harm to reputation and loss of earning capacity, and all special damages or financial losses that Plaintiff has suffered in an amount to be proven at trial;

F.   Order Defendant to pay Plaintiff for loss of fringe benefits in an amount that will be proven at trial;

G.   For additional damages to compensate for the taxation of Plaintiff's economic damages;

H.   For all relief available under Plaintiff's claims for age discrimination, including liquidated damages;

I.   Award Plaintiff prejudgment interest from the date each claim for damages was liquidated;

J.   Award Plaintiff prejudgment interest on all liquidated sums and interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

K.   Award Plaintiff interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

L.   Order Defendant to pay Plaintiff's court costs, expenses, and reasonable attorneys' fees in connection with this action, as provided in applicable statutes;

M.   Order Defendant to pay Plaintiff punitive damages sufficient to punish Defendant for its malicious actions and to deter such conduct in the future;

N.   For Plaintiff's continuing costs in this matter; and

O.   For such other and further relief as this court deems just and proper under the circumstances.

DATED this 21st day of November, 2018.

**JACKSON WHITE**

By:   Michael R. Pruitt, SBN 011792
      Nathaniel J. Hill, SBN 028151
40 North Center Street, Suite 200
Mesa, Arizona   85201
*Attorneys for Plaintiff*

**ORIGINAL** of the foregoing filed with the Clerk of the Court this 21st day of November, 2018.

By: _____

F:\STU\Smith, Russell\Pleadings\Complaint.docx

# EXHIBIT 2

**In the Superior Court of the State of Arizona
in and for the County of** Maricopa

~~CV2018-097217~~

Is Interpreter Needed? ☐ Yes ☒ No
If yes, what language:

CHRIS DEROSE, CLERK
BY _____ DEP
J. FOLTS, FILED
V. Martinez
18 NOV 21  PH 3: 14

(Please Type or Print)

**Plaintiff's Attorney** Michael R. Pruitt

**Attorney Bar Number** 011792

**Plaintiff's Name(s): (List all)       Plaintiff's Address:       Phone #:       Email Address:**
Russell A. Smith, c/o Michael R. Pruitt, 40 N Center Street, Ste 200, Mesa, AZ 85201, (480) 464-1111, mpruitt@jacksonwhitelaw.com

(List additional Plaintiffs on page two and/or attach a separate sheet).

**Defendant's Name(s): (List All)**
WM Corporate Services, Inc., a Delaware corporation; John and Jane Does I-X; Black Corporations I-X; White Partnerships I-X; and
Red Limited Liability Companies I-X

(List additional Defendants on page two and/or attach a separate sheet)

## NATURE OF ACTION

**(Place an "X" next to the one case category that most accurately describes your primary case.)**

**100 TORT MOTOR VEHICLE:**

☐ 101 Non-Death/Personal Injury
☐ 102 Property Damage
☐ 103 Wrongful Death

**110 TORT NON-MOTOR VEHICLE:**

☐ 111 Negligence
☐ 112 Product Liability – Asbestos
☐ 112 Product Liability – Tobacco
☐ 112 Product Liability – Toxic/Other
☐ 113 Intentional Tort

☐ 114 Property Damage
☐ 115 Legal Malpractice
☐ 115 Malpractice – Other professional
☐ 117 Premises Liability
☐ 118 Slander/Libel/Defamation
☐ 116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**

☐ 121 Physician M.D.    ☐ 123 Hospital
☐ 122 Physician D.O    ☐ 124 Other

**130 CONTRACTS:**

☐ 131 Account (Open or Stated)
☐ 132 Promissory Note
☐ 133 Foreclosure
☐ 138 Buyer-Plaintiff
☐ 139 Fraud
☐ 134 Other Contract (i.e. Breach of Contract)
☐ 135 Excess Proceeds-Sale
☐ Construction Defects (Residential/Commercial)
  ☐ 136 Six to Nineteen Structures
  ☐ 137 Twenty or More Structures

**150-199 OTHER CIVIL CASE TYPES:**

☐ 156 Eminent Domain/Condemnation
☐ 151 Eviction Actions (Forcible and Special Detainers)
☐ 152 Change of Name
☐ 153 Transcript of Judgment
☐ 154 Foreign Judgment
☐ 158 Quiet Title
☐ 160 Forfeiture
☐ 175 Election Challenge
☐ 179 NCC-Employer Sanction Action
  (A.R.S. §23-212)

Case No._____

- ☐ 180 Injunction against Workplace Harassment
- ☐ 181 Injunction against Harassment
- ☐ 182 Civil Penalty
- ☐ 186 Water Rights (Not General Stream Adjudication)
- ☐ 187 Real Property
- ☐ Special Action against Lower Courts
  (See Lower Court Appeal cover sheet in Maricopa)
- ☐ 194 Immigration Enforcement Challenge
  (A.R.S. §§1-501, 1-502, 11-1051)

**150-199 UNCLASSIFIED CIVIL:**

- ☐ Administrative Review
  (See Lower Court Appeal cover sheet in Maricopa)
- ☐ 150 Tax Appeal
  (All other tax matters must be filed in the AZ Tax Court)
- ☐ 155 Declaratory Judgment
- ☐ 157 Habeas Corpus
- ☐ 184 Landlord Tenant Dispute- Other
- ☐ 190 Declaration of Factual Innocence
  (A.R.S. §12-771)

- ☐ 191 Declaration of Factual Improper Party Status
- ☐ 193 Vulnerable Adult (A.R.S. §46-451)
- ☐ 165 Tribal Judgment
- ☐ 167 Structured Settlement (A.R.S. §12-2901)
- ☐ 169 Attorney Conservatorships (State Bar)
- ☐ 170 Unauthorized Practice of Law (State Bar)
- ☐ 171 Out-of-State Deposition for Foreign Jurisdiction
- ☐ 172 Secure Attendance of Prisoner
- ☐ 173 Assurance of Discontinuance
- ☐ 174 In-State Deposition for Foreign Jurisdiction
- ☐ 176 Eminent Domain– Light Rail Only
- ☐ 177 Interpleader– Automobile Only
- ☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
- ☒ 183 Employment Dispute- Discrimination
- ☐ 185 Employment Dispute-Other
- ☐ 196 Verified Rule 45.2 Petition
- ☐ 195(a) Amendment of Marriage License
- ☐ 195(b) Amendment of Birth Certificate
- ☒ 163 Other  Violation of the ADA and Retaliation
  (Specify)

## RULE 26.2 DISCOVERY TIER or AMOUNT PLEADED:

(State the amount in controversy pleaded or place an "X" next to the discovery tier to which the pleadings allege the case would belong under Rule 26.2.)

☐ Amount Pleaded $ _____        ☐ Tier 1        ☐ Tier 2        ☐ Tier 3

## EMERGENCY ORDER SOUGHT

☐ Temporary Restraining Order        ☐ Provisional Remedy        ☐ OSC        ☐ Election Challenge
☐ Employer Sanction        ☐ Other (Specify) _____

## COMMERCIAL COURT (Maricopa County Only)

☐ This case is eligible for the Commercial Court under Rule 8.1, and Plaintiff requests assignment of this case to the commercial Court. More information on the commercial Court, including the most recent forms, are available on the Court's website at https://www.superiorcourt.maricopa.gov/commercial-court/.

**Additional Plaintiff(s):**

_____

_____

**Additional Defendant(s):**

_____

_____

# EXHIBIT 3

CHRIS DEROSE, CLERK
BY: _____ DEP
J. FOLTS, FILED
18 NOV 2 ___ PH 3:17   V. Martinez

1    **JACKSONWHITE**
     ATTORNEYS AT LAW
2    *A Professional Corporation*

3    40 North Center Street, Suite 200
     Mesa, Arizona  85201
4    Telephone No.:      (480) 464-1111
     Facsimile No.:      (480) 464-5692
5    Email:      centraldocket@jacksonwhitelaw.com
     *Attorneys for Plaintiff*
6    By:   Michael R. Pruitt, SBN 011792
           Email:      mpruitt@jacksonwhitelaw.com
7          Nathaniel J. Hill, SBN 028151
           Email:      nhill@jacksonwhitelaw.com
8

9

10              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

11                **IN AND FOR THE COUNTY OF MARICOPA**

12   Russell A. Smith, a single man,                    CV2018-097217

13                 Plaintiff,
                                         Case No.:  CV_____
14   v.
                                         **CERTIFICATE RE:**
15   WM Corporate Services, Inc., a Delaware   **COMPULSORY ARBITRATION**
     corporation; John and Jane Does I-X;      **PURSUANT TO RULE 72**
16   Black Corporations I-X; White
     Partnerships I-X; and Red Limited
17   Liability Companies I-X,

18                 Defendants.

19

20           The undersigned certifies that he or she knows the dollar limits and any other limitations

21   set forth by the local rules of practice for the applicable superior court, and further certifies that

22   this case is not subject to compulsory arbitration, as provided by Rules 72 through 76 of the

23   Arizona Rules of Civil Procedure.

24

25

26

27   ///

28   ///

                                         -1-

1    **DATED** this 21st day of November, 2018.

2                              **JACKSON WHITE**

3

4

5    By:    Michael R. Pruitt, SBN 011792
            Nathaniel J. Hill, SBN 028151
6    40 North Center Street, Suite 200
     Mesa, Arizona   85201
7    *Attorneys for Plaintiff*

8

**ORIGINAL** of the foregoing filed with
9    the Clerk of the Court this 21st day of
     November, 2018.

10

11   By: _____

12   F:\STU\Smith, Russell\Pleadings\Certificate Re Compulsory Arbitration.docx

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

CHRIS DEROSE, CLERK
BY _____ DEP
J. FOLTS, FILED
**V. Martinez**
18 NOV 21  PH 3: 17

# JACKSON WHITE
### ATTORNEYS AT LAW
*A Professional Corporation*

40 North Center Street, Suite 200
Mesa, Arizona  85201
Telephone No.:      (480) 464-1111
Facsimile No.:      (480) 464-5692
Email:        centraldocket@jacksonwhitelaw.com
*Attorneys for Plaintiff*
By:    Michael R. Pruitt, SBN 011792
        Email:      mpruitt@jacksonwhitelaw.com
        Nathaniel J. Hill, SBN 028151
        Email:      nhill@jacksonwhitelaw.com

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

Russell A. Smith, a single man,

       Plaintiff,

v.

WM Corporate Services, Inc., a Delaware
corporation; John and Jane Does I-X;
Black Corporations I-X; White
Partnerships I-X; and Red Limited
Liability Companies I-X,

       Defendants.

Case No.: CV CV2018-097217

**DEMAND FOR JURY TRIAL**

Pursuant to Ariz.R.Civ.P. 38(b), Plaintiff files his demand for a jury trial in this matter.

**DATED** this 21st day of November, 2018.

**JACKSON WHITE**

By:    Michael R. Pruitt, SBN 011792
        Nathaniel J. Hill, SBN 028151
40 North Center Street, Suite 200
Mesa, Arizona  85201
*Attorneys for Plaintiff*

/ / /

-1-

1

**ORIGINAL** of the foregoing filed with
the Clerk of the Court this 21st day of
November, 2018.

By: _____

F:\STU\Smith, Russell\Pleadings\Demand For Jury Trial.docx

# EXHIBIT 5



Office Distribution

# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY

**\*\*FILED\*\***
01/30/2019
by Superior Court Admin
on behalf of Clerk of the
Superior Court

01/26/2019

## COURT ADMINISTRATION

Ct. Admin
Deputy

**Case Number:** CV2018-097217

**Russell A Smith**

**V.**

**W M Corporate Services Inc**

The Judge assigned to this action is the Honorable David Palmer

## NOTICE OF INTENT TO DISMISS FOR LACK OF SERVICE

You are hereby notified that the complaint filed on 11/21/2018 is subject to dismissal pursuant to Rule 4 (i) of the Arizona Rules of Civil Procedure. The deadline for completing service is 02/19/2019. If the time for completing service has not been extended by the court and no defendants have been served by this date, the case will be dismissed without prejudice.

All documents required to be filed with the court should be electronically filed through Arizona Turbo Court at www.azturbocourt.gov.

# Superior Court of Maricopa County - integrated Court Information System
## Endorsee Party Listing
### Case Number: CV2018-097217

| Party Name | Attorney Name | |
| --- | --- | --- |
| Russell A Smith | Michael R Pruitt | Bar ID: 011792 |

# EXHIBIT 6

CHRIS BEROSE, CLERK
BY                    DEP
D. HILL, FILED

19 FEB 19 PM 4: 52

Michael Pruitt
Jackson White Law
40 N. Center St.
Mesa, AZ 85201
(480) 464-1111
Bar No. 011792

**ORIGINAL**

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA**

RUSSELL A. SMITH,                          Case Number: CV2018-097217

                              Plaintiff,    **DECLARATION OF SERVICE BY A
                                            PRIVATE PROCESS SERVER**

            vs.

WM CORPORATE SERVICES, INC., et al,
                              Defendant.

Received by Rush Hour Legal Service to be served on **WM CORPORATE SERVICES, INC.,**.

I, Russell D. Hoffman, do hereby affirm that on the **15th day of February, 2019** at 2:10 pm, I:

served **WM CORPORATE SERVICES, INC.,** by delivering a true copy of the **Summons; Complaint;
Demand for Jury Trial; Certificate of Compulsory Arbitration** with the date and hour of service
endorsed thereon by me, to: **CT CORPORATION SYSTEM Scott Whaley (Agent) (Statutory Agent)** at
the address of: **3800 N. Central Ave. Suite 460, Phoenix, AZ 85012**, and informed said person of the
contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 40, Sex: M, Race/Skin Color: White, Height: 5'9", Weight: 200, Hair:
Brown, Glasses: N

I, being fully qualified under ARCP 4(e) to serve process within the State of Arizona and having been so
appointed by Maricopa County Superior Court, Declare under penalty of perjury that the foregoing is true
and correct and was executed on the above date.

Russell D. Hoffman
Process Server MC-7486

**Rush Hour Legal Service
P.O. Box 30997
Mesa, AZ 85275
(480) 797-9483**

Our Job Serial Number: RUL-2019000338
Ref: Russell Smith; 31927-001; M. Pruitt
Service Fee: $75.00

Copyright © 1992-2019 Database Services, Inc. - Process Server's Toolbox V8.0i



# EXHIBIT 7

3/5/2019                                   Civil Court Case Information - Case History

Skip To MainContent

[                    ] [ Search ]

Civil Court Case Information - Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2018-097217 | Judge: | Palmer, David |
| File Date: | 11/21/2018 | Location: | Southeast |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Russell A Smith | Plaintiff | Male | Michael Pruitt |
| W M Corporate Services Inc | Defendant | | Pro Per |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 2/19/2019 | AFS - Affidavit Of Service | 2/22/2019 | |
| **NOTE:** WM CORPORATE SERVICES INC | | | |
| 1/30/2019 | 322 - ME: Notice Of Intent To Dismiss | 1/30/2019 | |
| 11/21/2018 | CCN - Cert Arbitration - Not Subject | 11/27/2018 | |
| 11/21/2018 | COM - Complaint | 11/27/2018 | |
| 11/21/2018 | CSH - Coversheet | 11/27/2018 | |
| 11/21/2018 | NJT - Not Demand For Jury Trials | 11/27/2018 | |

## Case Calendar

**There are no calendar events on file**

## Judgments

**There are no judgments on file**

# EXHIBIT 8

1    Shayna H. Balch, SBN 024852
2    Lori A. Guner, SBN 031646
     FISHER & PHILLIPS LLP
3    3200 N. Central Avenue, Suite 805
     Phoenix, Arizona 85012-2407
4    Telephone:  (602) 281-3400
5    Fax:  (602) 281-3401
     sbalch@fisherphillips.com
6    lguner@fisherphillips.com

7    Attorneys for Defendant
8    WM Corporate Services, Inc.

9                    **SUPERIOR COURT OF ARIZONA**

10                     **COUNTY OF MARICOPA**

11   | Russell A. Smith,              | No. CV2018-097217 |

12                     Plaintiff,        **NOTICE OF REMOVAL OF
13                                       ACTION TO THE UNITED STATES
         v.                             DISTRICT COURT, DISTRICT OF
14                                       ARIZONA**
     WM Corporate Services, Inc.,
15                                      (Assigned to the Honorable David
                     Defendants.        Palmer)
16

17

18   **TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

19       **PLEASE TAKE NOTICE** that on March 7, 2019, Defendant WM Corporate

20   Services, Inc. filed a Notice of Removal of this Action from the Superior Court of

21   Arizona, County of Maricopa, to the United States District Court, District of Arizona. A

22   true and correct copy of the Notice of Removal of Action is attached as **Exhibit A**.

23       DATED this 7th day of March, 2019.

24                                      FISHER & PHILLIPS LLP

25                                      By  s/  Shayna H. Balch
26                                          Shayna H. Balch
                                            Lori A. Guner
27                                          3200 N. Central Avenue, Suite 805
                                            Phoenix, Arizona 85012-2407
28                                          Attorneys for Defendant

*(Left margin vertical text: FISHER & PHILLIPS LLP / 3200 N. Central Avenue, Suite 805 / Phoenix, Arizona 85012-2407 / (602) 281-3400)*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of March 2019 I electronically transmitted the attached document to the Clerk's Office using TurboCourt for filing, and I hereby certify that a copy of the foregoing document was served through TurboCourt and via U.S. Mail, postage prepaid, on the following:

Michael R. Pruitt
Nathanial J. Hill
Jackson White
40 North Center Street, Suite 200
Mesa, Arizona 85201
Attorneys for Plaintiff


 s/  Michelle C. Colwell

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 805
Phoenix, Arizona 85012-2407
(602) 281-3400